Special proceeding, begun before the clerk for the assessment of damages for taking land to be used as a street of the town, which was appealed by defendant to the Superior Court. The deed from Minnie O. Sugg to her coplaintiff, B. B. Sugg, describes the western line of the land conveyed to the latter as "thence with Elizabeth (Street) extended, through its intersection with Fifth Street," and the question is, where is this line? The defendant contended that it meant the eastern line of Elizabeth Street, if extended the width of that street north of Fifth Street, which is 49 feet, or a theoretical extension of that street, whether actually laid out south of Fifth Street or not, and the court below seems to have taken that view. This would fix the eastern line of Elizabeth Street and the western line of plaintiff's lot below Fifth Street, at C, D, as shown on the official map, and if this be the line, the ruling was correct, and the plaintiff cannot recover. *Page 691 
The defendant also contends, and there was some evidence to show that the street had been actually opened to that line. The plaintiff, however, contends and offered much testimony to show that Elizabeth Street had been actually laid out by the defendant below Fifth Street, as represented by the letters A, B, E, F, on the map, and was used by
[EDITORS' NOTE: THE MAP IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 169 N.C. 691.]
the public, and fully recognized by the defendant as the only extension of Elizabeth Street south of Fifth Street, and that, as thus laid out, the western line of plaintiff's land would be at A, B, as shown on the map, or the eastern line of the Wiley Vines land, and that the call of *Page 692 
(608) the deed above mentioned should be extended to that line, as it is the line intended by the parties to the deed as the western line of the land conveyed.
The jury returned the following verdict:
1. Was the plaintiff the owner of that portion of Elizabeth Street lying on the western line of his lot described in the complaint, 25 feet wide and 160 feet long, as alleged? Answer: "No."
2. If so, what damages is plaintiff entitled to recover of defendant on account of the taking of the said lot for a part of Elizabeth Street? Answer: "$500."
(609) The court instructed the jury to answer the first issue "No," and that they would not answer the second issue. As this was the direction of a verdict, we need only set out some of the testimony favorable to the plaintiff's contention. The deed of Minnie Sugg to B. B. Sugg, dated 1 September, 1910, after describing the land conveyed, adds these words to the description, "being the westwardly portion of the lot conveyed by T. J. Jarvis, commissioner, to Minnie O. Exum (now Minnie O. Sugg)." The Jarvis deed, dated September, 1894, conveys the land west of the A. C. L. R. R. (formerly Wilmington and Weldon Railroad), and "on the south side of Fifth Street and adjoining the lot of Reuben Adams, the lots of Margaret Miller and others." The deed of J. W. Vines to the town of Greenville, dated 13 January, 1904, conveys land of the following description: "Beginning at an iron stake on the south side of Fifth Street on the river road, the point at which the western line of Elizabeth Street as originally laid would intersect the line of said Vines, and runs the course of said Elizabeth Street south 14 degrees and 30 minutes west about one hundred and forty feet to Delphia Wooten's line, then with her line and the Henry Sheppard line (now owned by said town) an easterly direction to J. L. Sugg's southwestern corner, then with said Sugg's western line a northerly direction about one hundred and sixty-one feet to his northwest corner in said street or road, and then with said street or road to the beginning. Said piece or parcel of land hereby conveyed is for the continuation of Elizabeth Street." This deed recognizes the line as claimed by plaintiffs.
B. B. Sugg, one of the plaintiffs, testified:
"I am the Sugg mentioned in the deed from Minnie O. Sugg to B. B. Sugg, and I was living in Greenville at the time. It was 1 September, 1910. Minnie O. Sugg was the wife of J. L. Sugg, and J. L. Sugg was my uncle. Minnie O. Sugg prior to her marriage was Minnie O. Exum, referred to in one of the deeds introduced in evidence. At the time the deed was executed I was living on the property, a part of which I purchased at the time. When I purchased the lot from Minnie O. Sugg I knew where the Wiley Vines lot was; it was just west of the Sugg *Page 693 
property, as indicated on the map. I saw the property indicated between `CD' and `AB' several times a day. At the date of my purchase of the property the land lying within the black line was opened as a part of Elizabeth Street, that is, the strip purchased by the town from Wiley Vines; it was purchased, opened, and used as the street connecting Elizabeth Street and Bonner's Lane. In driving from Fifth Street to Bonner's Lane you will partly drive over the Wiley Vines strip and partly on this side, but mostly on the Wiley Vines property which the town purchased. The strip indicated as lying between `AB' and `CD' was never opened or used by the public as a street, but my uncle did drive over it before he died to reach his stables, which were (610) in the rear of the property from Fifth Street. I never knew the town intended taking my property for a street until several months after I had purchased it, and I did not know then that they intended taking it until they had put thirty or forty hands to work out there digging it down. I protested at the time and was then asked permission by the town to be allowed to go ahead, but refused. The town purchased the property indicated on the map between lines `AB' and `EF' from Wiley Vines in 1904. My western line is indicated by letters `AB.' My line is the old line between Sugg's and Wiley Vines' land, and it is evidenced by iron stakes. The Sugg line called for in the deed from Wiley Vines to the town of Greenville is my line indicated on the map by letters `AB.' When I purchased the property, the strip the town bought from Wiley Vines was opened and used by the public. When the town hands were cutting down the property they went over on the Sheppard lot some and dug in the back of my line also. They have left an embankment in the rear of my property of six and one-half feet that it would be impossible to drive over. I gave in my property for taxation at the same as I have always given it in since I purchased it, and although I considered it damaged considerably by the town's action, I knew that I had no authority to reduce its assessed taxable valuation. I paid $1,150 for the property in 1910 and I purchased it from my aunt by marriage, with whom I was living at the time. It fronts on Fifth Street, and all property in that section of the town has certain quadrupled in value within the last four years. Since the town has opened the street through the property purchased from Wiley Vines you can drive from Fifth Street through by Bonner's Lane to the Atlantic Coast Line depot, but it is very difficult driving. There has been passing from Fifth Street to Bonner's Lane over this property ever since the town purchased from Vines and opened the street, but my property has never been in general use by the public, and such passing was only by permission, and any use of it was only permissive. Several years ago there was a fence clear across the property and the Wiley Vines property, *Page 694 
running from east to west, and when people passed through it had to be taken down and was often left down, which fact I remember annoyed my uncle very much. The remnants of the fence are there now. Shortly after this fence was moved Mr. Sheppard sold his lot just back of mine to the town for the purpose of opening a street. That deed calls for my line. The fence was torn down before I bought the property and there was some permissive passing that I knew of when I took the deed, but the town never undertook to take my property for public use as a street until about two and a half years ago. They had prior to this time purchased the Vines and the Sheppard lots which connect Fifth Street and Bonner's Lane, and (611) this was the property that the passing was supposed to be through. I do not know, of my own knowledge, what took place prior to 1909, for I only came here during that year. When I bought my property my aunt reserved a driveway back of my lot so that her wood pile in the rear of her property could be reached from Fifth Street or from Elizabeth Street extended. However, this driveway has never been used, and although the deed reserved the right of use, the property was still to be mine. If the town had not taken twenty-six feet of my property I would have enough frontage on Fifth Street for two lots, but as it is, I will not have enough frontage left there to make two lots large enough."
Wiley Vines, witness for the plaintiffs, testified:
"I own property on Fifth Street; it is located on the Tarboro road or on the south of Fifth Street west of Elizabeth Street extended. I bought the property from Mr. Oscar Hooker. I sold a strip of land to the town of Greenville, but before I sold this property I was joined on the east by the Sugg property; an old fence stood on the line between us and an old spring was in there somewhere near the line on my side. I knew where the line between us originally ran, and I put iron stakes on the line or as near to it as I could come. I showed Mr. Dresbach the stake that I set when he was up there making the survey. My deed calls for the Sugg property, and until I sold it to the town my property joined the Sugg property on the east. The deed I gave the town of Greenville calls for the Sugg line. The property I sold the town is shown on the map as enclosed in black lines. It was several years after I sold to the town before I noticed any cutting or grading on the property. I do not remember just how long. There was no street opening from Fifth Street to Bonner's Lane, but people went across there as a near cut. The spring I referred to was two or three or four feet from the line, out in the street as it now stands. The driving was on the east side of the spring; I do not know whether the driving was on Mr. Sugg's side or mine. Before the town bought my property and opened the street it *Page 695 
was grown up in reeds and briars. There used to be an old ditch that is now filled up; it was located on my side of the line."
Lance Wooten, witness for the plaintiffs, testified:
"I live on Elizabeth Street, as it is now opened. I live up there at Delphia Wooten's. I built there in 1901 myself and I know the locality. I remember when I moved up there, 1901, there was a fence across Mr. Sugg's property. I don't know how long it remained there, but I remember sometimes when I would go in it would be down, and when I would come out it would be up. There used to be a wall on the line between Wiley Vines' property and Mr. Sugg's property, but after Wiley sold to the town I think he moved it. I have seen two iron stakes up there; they were right behind the wall, and when the wall was moved the stakes were left (612) there. I have not seen the stakes lately and no one has told me anything about them. I think the property was cut down by the town in 1911; it was cut right back to my house, about as deep as my house."
Jack Pitt, witness for the plaintiffs, testified:
"I have been living here about 60 years; been working there about 15 years. I used to work for Mr. Sugg and I know where the fence was between Mr. Sugg and Wiley Vines. It was right straight across from where there was a cedar behind Wiley Vines' house. There was a stump there and a wire fence. I don't know who kept up the fence, but I put it up several times for Mr. Sugg when people would leave it down. After the town bought from Wiley Vines, people drove through his side regularly. I remember where the line was; there were old posts there. He sold to the town up to the line and it made a good wide little street. The people drove over there and used it as a street after the town bought it from Wiley. I remember when they got the property graded out, but I don't know how long it has been. It was since Mr. B. B. Sugg bought."
W. C. Dresbach, witness for the plaintiffs, testified:
"The heavy black lines drawn on the map in an ell-shape just across Fifth Street from the Sugg property is the concrete wall to Mr. C. S. Carr's front yard, and it is impossible to extend Elizabeth Street to Bonner's Lane without taking in this property." Q. Has it been extended the full width? Defendant objects; sustained; plaintiffs except.
There was testimony given by the defendant's witnesses which tended to contradict that of the plaintiffs, but it need not be set out. Judgment was entered upon the verdict for the defendant and an appeal taken by the plaintiffs, after reserving their exceptions.
After stating the case: We have often said that what is the boundary of a tract of land is a question of law, but where it is, we have as often held to be a question of fact. The call in the deed of Minnie O. Sugg to B. B. Sugg, "thence with Elizabeth extended through its intersection with Fifth Street" does not necessarily mean that the extension must be the full width of the northern or original part of the street, as there is evidence in this case, and strong evidence, too, that Elizabeth Street had been extended below Fifth Street by the town, but not the same width as above, and it is not infrequently the case that the extension of a street (613) beyond its intersection with another street is not of the same width as that portion of the street that is extended or lengthened, and sometimes the extension does not have lines which are coincident with or opposite to those of the other part of the same street, as offsets are sometimes to be found. But, however this may be, the deed, and the evidence taken in connection with the physical facts, show that the parties may have intended that the western line of the land conveyed to plaintiff, B. B. Sugg, should not be at CD, as shown on the map and as contended by the defendant, but at AB, as shown on the map and as contended by the plaintiff. Did the parties mean the lines of Elizabeth Street as
theoretically or mathematically extended or as actually extended at the time?
The town was not bound to accept the land as a part of its street, even though the parties may have intended by the deed to have that much space open, as a dedication for the street, to await the acceptance of the town, because the town has the right to decide where its streets shall be and how long and how wide they shall be. Kennedy v. Williams, 87 N.C. 6. We do not think the call was so definite, precise and unambiguous as to leave no room for fair opinion as to what was meant and to exclude all construction of the deed. If it was meant by the parties to establish the line at CD, then that, in law, is the line regardless of the action of the town; but it was competent for the jury, upon all the evidence, to consider and say whether that was meant, or whether, on the contrary, the parties intended to refer only to the eastern line of Elizabeth Street below Fifth Street as actually established by the town. A reading of the deed would, at first sight, and without any knowledge of or attention to the facts, seem to favor the defendant's view; but when they consider the pertinent evidence, a very different conclusion might be reached by the jury.
There is this to be further said, that the parties may have meant Elizabeth Street as extended, and not mere extended with the identical lines of the original street. There is another view, of which the deed and other evidence are susceptible, and one which the jury may take, if the case is submitted to them. The line is not bound to make the street *Page 697 
of the same width on the south as on its north side. What shall be its conformation and location is a matter committed by the law entirely to the judgment and sound discretion of the public authorities having the matter in charge, and if they have already acted, at the time a deed is made, and delineated the street, so that it has become a fixed and established highway of the town, there is no reason why the parties may not be considered to have written their deed with reference to this well known physical fact, and that, when they called for Elizabeth Street extended, they meant as already extended by the town, rather than that the street should be considered as theoretically extended on the same side lines as those of the original street. Whether they (614) intended a theoretical or the practical extension of the line was eminently a question for the jury to determine. In this connection it may be well to state several rules laid down in the books and sanctioned by the authorities:
1. Although the court should decide who holds title where it rests upon the legal effect of the deed, yet the court may instruct the jury that the legal title vests in a certain person or not, and leave it to them to decide as a fact who is entitled, where the identity of such person is in issue. This would apply equally to land, where the question of identity is involved.
2. The intention of the parties as apparent in a deed should generally control in determining the property conveyed thereby. But if the intent is not apparent from the deed resort may be had to the general rules of construction.
3. Where the words used in the description in a deed are uncertain or ambiguous and the parties have by their acts given a practical construction thereto, the construction so put upon the deed by them may be resorted to, to aid in ascertaining their intention.
4. The entire description in a deed should be considered in determining the identity of the land conveyed. Clauses inserted in a deed should be regarded as inserted for a purpose, and should be given a meaning that will aid the description. Every part of a deed ought, if possible, to take effect and every work to operate.
5. If recitals in a deed are inconsistent or repugnant, the first recital does not necessarily prevail over the latter, but the whole language of the deed is to be construed together in order that the true construction may be ascertained. In such a case the court will look into the surrounding facts and will adopt that construction which is the most definite and certain and which will carry out the evident intention of the parties. And if the land conveyed is sufficiently identified by certain parts of the description, an impossible or senseless course should be disregarded, and the deed sustained. *Page 698 
6. Where the description of the property intended to be conveyed is ambiguous, the identity of such property must be gathered from the intention of the parties as shown by the instrument itself and the accompanying circumstances, such as those surrounding and connected with the parties and the land at the time. Words may, if necessary, be qualified by intendment and particular clauses and provisions qualified, transferred, or rejected in order to ascertain the intention.
7. Another instrument may, in some cases, be construed with a deed as a part of the same transaction for the purpose of determining the identity of the property conveyed. And a recorded plat of lots may be construed with a deed in order to determine the dimensions of the property, or a town plan may be referred to.
(615) 8. The description of the property conveyed by a deed should be construed against the grantor and in the manner most beneficial to the grantee.
9. In order to ascertain the intention of the parties in respect to the property conveyed, reference may be had to the state of facts as they existed when the instrument was made and to which the parties may be presumed to have had reference.
10. A description of the property as occupied by the grantor may control other words in the description in determining the identity of the property conveyed. 13 Cyc., pp. 626, 627, 628, 630, and cases in the notes.
The full description in the plaintiff's deed is as follows: "Situate in the town of Greenville, Pitt County, North Carolina, on the southerly side of Fifth Street, and eastward side of Elizabeth Street and beginning at an iron stake on Fifth Street in said town of Greenville, located on the southern edge of Fifth Street, between the A. C. L. Railroad and Elizabeth Street and runs thence a southerly direction a straight line to a stake in the back line of the lot of Minnie O. Sugg; then a westwardly direction with the back line of Minnie O. Sugg lot to Elizabeth Street extended; thence with Elizabeth extended through its intersection with Fifth Street; thence with Fifth Street an eastwardly direction to the beginning, an iron stake, and being the westwardly portion of the lot conveyed by T. J. Jarvis, commissioner, to Minnie O. Exum by deed dated 19 September, 1894, and recorded in the register's office in Pitt County in Book S-5, page 378; Minnie O. Exum mentioned in said deed being the same person as Minnie O. Sugg, the grantor in this deed. Minnie O. Sugg, the grantor in this deed, hereby reserves to herself, her heirs and assigns the right of ingress and egress for the purpose of a driveway from Elizabeth Street extended over and across the lot herein conveyed along the back line of the same to the lot whereon the said Minnie O. Sugg now resides, adjoining the lot herein conveyed." *Page 699 
The words "through its intersection" were evidently intended for "to its intersection," for otherwise they would be meaningless. We have nothing, then, except the words "Elizabeth Street extended," but extended how: according to and with the lines it has north of Fifth Street, or extended as was done by the town? The word "extended" is not, of itself, sufficient to confine the description to the lines north of Fifth Street merely elongated, or in other words to the width at that part of the street, for standing by itself it may mean a theoretical extension, or one that is actual, which is sometimes called a practical one, that is, one which was made on the ground at the time of this conveyance. If there had been none such, it might well be argued that the call should be restricted to a theoretical location of the street's eastern line that would exactly correspond with the lines north of Fifth Street.
If we are governed by the rules adopted for our guidance and (616) which are set out above, we must look at the description as a whole, giving effect to every material part of it. The very opening sentence is "situate on the southerly side of Fifth Street and the eastwardside of Elizabeth Street," and the latter words, which we have italicized, would surely call for inquiry as to where the east side of the street is, for the word "extended" is not used, in this connection. We may, under those rules, as we have seen, take into consideration that Mrs. Sugg has in the deed expressed the intention clearly to pass to B. B. Sugg "the westwardly portion of the lot theretofore conveyed by T. J. Jarvis, commissioner, to her," which was all the land west of the line GH, and extending to the eastern line of Wiley Vines, as she owned that land and acquired title to it under the Jarvis deed. We do not mean to say that this part of the description is controlling, but that it may be taken into consideration in order to determine what she intended to convey, as gathered from the entire deed.
It is said in 13 Cyc., 637: "The question as to what property passes by a deed may be controlled by a general clause conveying all of the grantor's property. The construction of a description with such a clause therein is dependent upon the intention of the parties, and where it appears from the entire deed that it was the manifest intention to convey all of the property of the grantor a construction consistent therewith will be given. In construing a clause of this character the rule applies that the language is to be construed against the grantor."
It is true that a particular description, which is clear and explicit and completely identifies the property intended to be conveyed, will not be varied or enlarged by a more general and less definite one, as, in such a case, the former will be considered as expressing more certainly and reliably the intent of the parties rather than the latter, but, notwithstanding this rule of construction, a general clause or recital in a deed, *Page 700 
which broadens the terms of the grant, will not be altogether excluded as something that sheds no light on the meaning, though it does not override the other more definite call. 13 Cyc., 631 (e).
This doctrine which requires us to look at the whole deed and to give some effect, at least, to all of its several parts, was clearly stated, with apt citation of authority by Justice Hoke in Railroad Co. v. RailroadCo., 147 N.C. at p. 382: "It is well recognized that the object of all rules of interpretation is to arrive at the intention of the parties as expressed in the contract, and that in written contracts which permit of construction this intent is to be gathered from a perusal of the entire instrument. In Paige on Contracts, sec. 1112, we find it stated: `Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not (617) what the separate parts mean, but what the contract means when considered as a whole.' And while in arriving at this intent words are prima facie to be given their ordinary meaning, this rule does not obtain when the `context or admissible evidence shows that another meaning was intended.' Paige, sec. 1105. And, further, in section 1106, it is said that the context and subject-matter may affect the meaning of the words of a contract, especially if in connection with the subject-matter the ordinary meaning of the term would give an absurd result. Again, as said by Woods,J., in Merriam v. United States, 107 U.S. 441: `In such contracts it is a fundamental rule of construction that the courts may look to not only the language employed, but to the subject-matter and surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made.' And in Beach on Modern Law Contracts, sec. 702, the author says: `To ascertain the intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects they had in view. The words employed, if capable of more than one meaning, are to be given that meaning which it is apparent the parties intended them to have.'" It is then added that parol testimony was properly received to show the attendant facts and circumstances for the purpose of a proper construction of the lease, citing Ivey v. Cotton Mills, 143 N.C. 189, and Ward v. Gay, 137 N.C. 397. Our conclusion is that the description in the deed is sufficiently indefinite to raise an issue for the jury to decide, under the guidance of the court upon the law, as to what the parties intended.
It was stated on the argument that the court ordered a nonsuit as to thefeme plaintiff, because she had not filed her claim with the proper municipal authorities as required by Revisal, sec. 1384. This section, which corresponds with section 757 of the Code of 1883, has been construed by this Court in several cases and held not to apply to actions *Page 701 ex contractu where the damages are unliquidated, nor to torts. Shields v.Durham, 118 N.C. 450; Frisbee v. Marshall, 119 N.C. 570; Sheldon v.Asheville, ibid., 606; Nicholson v. Commissioners, 121 N.C. 27, and finally in Neal v. Marion, 126 N.C. 412.
We do not see why she is a necessary party. If she did not, by her deed, convey this land to the plaintiff, but has retained the title in herself, her right and her action to recover the land, or damages for its taking, would be separate and distinct from his claim, and her present coplaintiff would have no interest therein, and if she did convey it, her presence is not required to vindicate his rights under the deed, as she had parted with the title to him. But had the plaintiff, B. B. Sugg, alleged that, if the land did not pass by the deed, it was intended that it should, and the description, if it was omitted by a mutual mistake of the two plaintiffs in this action, and, upon this allegation, (618) had asked for a correction, as he may yet do, with the permission of the court, then she would be a proper, if not a necessary party. On proper application to the court below, the plaintiff will, no doubt, be allowed to amend the complaint, so as to make the proper allegation in regard to the mistake, if there was one, and in the event that permission to amend is granted, Mrs. Sugg would be made a party, plaintiff or defendant, as the parties may be advised. If this is done and the jury decide, under the instructions of the court, that the deed did not convey the land, they could then pass upon the issue as to the mistake, and say whether or not the effect of the deed, as they thus find it to be, was produced contrary to the intentions of the parties, and that, while it was their purpose to convey the land, they had failed to insert it in the deed by their mistake or the inadvertence of the draftsman acting under their instructions.
It follows from what we have said that there was error as to the plaintiff B. B. Sugg, for which there must be a new trial. We do not think that Mrs. Sugg has appealed, and she tendered no separate case on appeal.
New trial.
Cited: Lee v. Barefoot, 196 N.C. 112; Hood, Comr. of Banks, v. Pittman,209 N.C. 741; Nevins v. Lexington, 212 N.C. 618; Ivester v.Winston-Salem, 215 N.C. 7; Lee v. Walker, 234 N.C. 694, 695; Rowe v.Durham, 235 N.C. 161. *Page 702